We have two argued cases, the first of which is Oppenheimer & Co. v. Mitchell, and I believe it's Mr. Townsend first, please. Good morning, Your Honor. Good morning. Thank you. I'd like to reserve three minutes. Keep your eye on the clock. We'll try to help you. I sure will. May it please the Court, I represent the defendants and appellates in this matter, the Mitchells and the Hoppers. Mitchells and the Hoppers purchased securities from John Woods and his controlled investment fund while Mr. Woods was a broker at Oppenheimer and a registered broker. The legal question here for the Court is an application of the definition of customer under FINRA Rule 12-200 as applied to these facts. This has not been visited since Reno by this Court, and it is generally understood that customer includes associated persons and people through whom those purchases were made. What role, if any, do you believe Reno plays in this case? Well, it sets the foundation upon which this applies, and I think Reno is controlling authority here. We ask that the Court apply Reno faithfully, both by its policy and language. Aren't the facts of Reno quite different than this? Do you have an associate involved? Why is that the same as this case? Well, it's just the most recent case that this Court has applied Rule 12-200. Right, but I'm just saying I get that point, but in terms of the facts, I find Reno to be quite distinct from this case. That's right. Am I missing something? No, you're correct in that that was the application of a form selection clause in a separate case, but the framework provided in Reno is what provides us guidance here, as well as other circuits who have addressed this issue as to the application of an associated person and purchases through an employee or an agent. Here we have both legal issues to consider and significant errors of facts below in terms of citing the record, and I'd like to spend some time for the Court talking about the evidence that's in the record that was not accurately represented in the summary judgment orders. I know there's a lot you can talk about. You assume we've all read the briefs and the record. I'm sure you'll get to this, but this is important, at least to me, in terms of your case, and that is it doesn't seem like your client had any direct interaction with Woods other than a single call between Mitchell and Woods in 2016. Is that right? I think, strictly speaking, that's a correct statement, but I think it's an overly narrow characterization of the way this transaction's happened. Mr. Mooney was both a cousin of Mr. Woods and understood through Horizon and represented to my clients and others that he was selling Oppenheimer products. Did he say that? He did say that, and his testimony is uncontroverted on that. And he says that that's at ER-308, ER-427, ER-23. Mr. Mooney also testified that he had no incentive to testify in either way, no pecuniary gain in his testimony. That's at ER-208. Mooney says that he's an agent, and he specifically identifies Oppenheimer. That's ER-225 and ER-223. And similarly, Mooney touted the Oppenheimer relationship and said this is an Oppenheimer product to the Mitchells and the Toppers. As I look at this, and I'm going to call this your alter ego theory, it seems like you're saying that by investing in Horizon that the defendants transacted with Woods. Is that correct? Correct. And that's consistent with the structure of FINRA and the supervisory authority under Rule 3110, which requires that Oppenheimer police and investigate and undertake the supervisory authority over its brokers. In fact, Oppenheimer, if you look at ER-499, Oppenheimer was aware of this relationship and had concerns about it and called Woods in 2000. I'm not sure what date on that I have to look at. That's at ER-499. But they called Woods and said, hey, are you associated? They had the red flags. They called Woods, and he says, no, I'm not surprisingly. The perpetrator of Ponzi scheme says, no, I'm not committing a Ponzi scheme. And that satisfies Oppenheimer. Oppenheimer knew and was aware that these are all going through Horizon. Would you agree, if we adopt your approach, which is what the Second Circuit did, to say that Woods was an associate and, therefore, fit under the FINRA rules, that it really all comes down to whether the relationship between Mitchell and Woods was enough of a transaction to fit within the law to bring him into this case? Well, I think two things about that. I mean, Horizon is Woods. And so it is a wholly owned entity that's controlled by Woods. And if you allow for another rule, which allows someone to create a shell corporation and bring someone in and be publicly represented and associated with Oppenheimer, as Mr. Woods is during this whole time, also associated with Horizon, which is all publicly available in the Georgia records, and those are also in the file. So was Horizon publicly associated with Oppenheimer? Horizon is publicly associated with Woods, and Woods is publicly associated with Oppenheimer. So it's not a very far way for Oppenheimer to have gone to undertake its supervisory authority over Woods. And the association between Woods and Oppenheimer was well known within Horizon. And that's testified in the record by Mooney and Britt Wright, who was another salesperson. But also I want to go back to this comment of minimizing the or to not minimize the phone call that occurs between Woods and the Toppers. They do call Woods, and they get the assurances from Woods. There's no transcript of that communication. There's a note in the order saying, well, we don't know what they said. First of all, let me ask you. Do you agree there was no direct customer relationship between the defendants and Oppenheimer? Yes. So it all hinges on Woods. So Oppenheimer could have called Woods and inquired about Horizon without having any knowledge of your clients, right? Well, if they had known Horizon, it's not legal for Woods to have created a separate entity and sell securities while a FINRA member through another entity. You're required to sell only through Oppenheimer. So he was off conducting this side business, this Ponzi scheme. But Horizon, I mean, Oppenheimer could and should have known that and seen it. And you base that on what? The fact that they called Woods? It's just that it's publicly. They have the supervisory authority. I'm just saying I'm trying to, you know, if there is a relationship, we need to understand the nature of the relationship. And I think what you're saying is that Oppenheimer called Woods. They knew about Horizon. Therefore, your clients are part of the team, are part of the involvement. They're within the supervisory authority. Woods's actions are within the supervisory authority of FINRA and Oppenheimer under FINRA rules. So if Woods was an associate under FINRA and he was doing all kinds of bad stuff but had nothing to do with your client, would that automatically mean that your client, because Oppenheimer called Woods about some stuff he was doing that was wrong, would it mean that your client was covered? Well, it's important to note here this is just what gets us into arbitration. Oh, no, I understand that. I understand that. I understand that. In order to have that, you've got to have the association, get that part. What I'm struggling with is how do you tie your client to Woods to Oppenheimer? I think that Woods and Horizon and Southport are all associated persons because they are all Woods, and they are Woods's entities. So it's not just Woods that's an associated person. Any entity that he's formed is also an associated entity? Correct, because he can't do that under FINRA rules. I understand that. But what case law would you cite to the effect that an associated person, that any entity that he or she forms is automatically an associate of, in this case, Oppenheimer? Well, I would point to the brief of the Investors Association in the amicus, and their analysis of that I found quite persuasive to say, if you allow for this to create a shell corporation to insulate it, you're really undermining the impact of FINRA. To answer your specific question, do I have a citation for you, which I can see I don't have a specific, and maybe my colleague will help me on rebuttal if he has some comments. But I don't want to go past this direct communication between the Hoppers and Woods, and I liken it, you know, if you were to invest in Berkshire Hathaway, do you have to talk to Warren Buffett, or can you talk to one of his salespeople? Mooney is just a salesperson for Woods. The money gets to Woods. He's ultimately the beneficial owner. He's a cousin. He happens to be a former Oppenheimer person. He knows Woods through Oppenheimer and knows that association, and that's publicly known. Our clients went and did Internet research and made their purchase based on the understanding that this was Woods and Oppenheimer's good name, and this was ultimately confirmed. And then the Seahawks tickets come, too, and as a Seattle resident, I want to say that those are of great value. But these are not nothing. This is obviously a scheme that's being perpetuated by Mr. Woods. He's been convicted of wire fraud, and he was doing it all under Oppenheimer. Do you want to save your time for rebuttal? Thank you very much. Very well. All right. Mr. Frank. Good morning, Your Honors. May it please the Court, Jason Frank from Morgan Lewis on behalf of Oppenheimer and Company. I'd like to pick up on the Court's first question, which is what role does Reno play here? And there's a two-part answer. The first is, well, it sets the rule for what is required to be a customer and therefore to obtain an ability to force Oppenheimer to arbitrate. But on the other hand, the Court is exactly right. The facts are totally different. In that case, the broker-dealer offered a service and was paid, and that is the touchstone of the customer test. This has been rearticulated in the Second Circuit in the Abar case where they've articulated it as a purchase or account case. If you have an account with the broker-dealer, you're a customer. If you've made a purchase from the broker-dealer or it's an associated person, you're a customer. And that is not a test that the claimants here want applied because the fact of the matter is they made a purchase from a gentleman named Michael Mooney. Michael Mooney was their investment advisor. He was an associated person at Southport. And as a result, these claimants, the appellants here, they're customers of Michael Mooney. They're customers of Southpoint. They are not customers of Oppenheimer and Company. And to give an example, I would liken this to an investment in Coca-Cola. If a broker, an associated person, solicits a client to invest in Coca-Cola and that client decides, you know what, I would like to call the Investment Relations Department of Coca-Cola, find out more about Coca-Cola. I'm about to invest. And then that person invests in Coca-Cola. They are a customer of their broker. They're a customer of that associated person. They're a customer of the associated person's FINRA member firm. They are not a customer of Coca-Cola. And this is what the appellants are trying to do here. They're trying to transform their purchase from Michael Mooney into a customer relationship with Horizon and therefore Mr. Woods and therefore somehow Oppenheimer and Company. What role, if any, well, what relationship, if any, does Mooney have with Oppenheimer? None. Mooney was a former associated person of Oppenheimer, and the record reflects that he left Oppenheimer in the year 2010, six years before the purchase made by the appellants here. And so what I'd like to emphasize is that the Abar case in the Second Circuit that sets the test explains why it's so important to keep in mind the simple purchase or account rule. Because when we don't keep that in mind and we go down this rabbit hole of trying to better understand the nature of all of the relationships and what was represented to whom about what and what claimants believe, we get away from clarity. Is it fair to say that we can have an associated person under FINRA Rule 12,200 without having a customer? Sure, you can have an associated person who doesn't form a customer relationship. So if arguably Wood was an associated person and if your defendants were not customers, they still lose. Is that right? A great example of this, Your Honor, is the ‑‑ I might mispronounce it. It's the Centaurus v. Ausloos case. And in that case, Mr. Ausloos bought an unregistered security, a deferred sales trust from a guy named Binkelli. Binkelli had a business called the State Planning Team. Binkelli was a registered rep. He was an associated person of Centaurus. Now, Mr. Ausloos tried to bring an arbitration against Centaurus and Centaurus, like Oppenheimer here, moved to and joined that and was successful. Why? The court held that Mr. Ausloos was not a customer because he purchased something from EPT. He entered into a relationship with this other entity, not Centaurus or Binkelli. And that's similar to this case, the Mitchells and the Hoppers bought Horizon, owned by Woods. Now, in granting the preliminary injunction, I'd just like to quote what the court said in that case because it applies directly here. The court wrote, Ausloos seemingly argues that if one has a business relationship with an associated person of a FINRA member, this makes the person a customer. This cannot be correct. It is possible that an associated person of a FINRA member could have an independent company as Binkelli appears to have with EPT. If one does not purchase a good or service from this FINRA member, he is not the FINRA member's customer simply because he purchased the good or service from an associated person acting on behalf of his or her own independent company. That is exactly the fact pattern here, Your Honors. Did they address the issue raised by opposing counsel that that's improper for an associated person to engage in a separate transaction or have a side business? That seemed to be what opposing counsel argued. I don't believe that is addressed in that case, Your Honor. But whether or not there's a supervisory issue doesn't give rise to customer status, right? So not only is that explained in the Abar case, but I believe in the Raymond James v. Carey case out of the Fourth Circuit. I want to say it's footnote three, but in a footnote there, the circuit court explains that these sorts of supervisory allegations, they go to the merits of the claim, not to whether or not the claims are arbitrable. What's the best, most closely affiliated case you can cite to us that fits the facts of this case in terms of the customer? I guess I would cite two cases. The first is the Centaurus v. Auslitz case we just discussed, but I'd also turn the Court's attention to Morgan Keegan v. Silverman. This is a Fourth Circuit case that affirms the grant of a permanent adjunction where defendants purchased shares in bond funds. They purchased those shares from their broker, Legg Mason, not Morgan Keegan. Morgan Keegan was the principal distributor and the underwriter of the funds. So while there was communications between Morgan Keegan and Legg Mason, just like there are alleged communications here between Woods and Mooney, there and there Morgan Keegan employees encouraged Legg Mason to purchase funds and to have customers purchase funds. And the Legg Mason broker relied, according to the Court, on Morgan Keegan's marketing materials. But there the Fourth Circuit held that the claimants were not customers because there was no contractual relationship with Morgan Keegan, and the purchases were made from Legg Mason, not Morgan Keegan. So I think those are the two cases I would direct the Court to as closest to our facts here. Thank you. And so one of the things I would just like to emphasize is that the facts here that dictate affirmance, they're not that complicated. The fact of the matter is there was no account at Oppenheimer and there was no purchase from Oppenheimer or an associated person of Oppenheimer. The Mitchells concede that they had no contact with anyone at Oppenheimer. That's S.E.R. 24 and S.E.R. 53. That is testimony from both Dory and Stephen Mitchell. Mike Mooney sold the Mitchells Horizon securities. That's in their declarations, which is found at the record at E.R. 301 to 307. The Hoppers were also sold Horizon by Mike Mooney. That can be found in their declarations at E.R. 293 to 298. At deposition, Ms. Hopper admitted that her sworn declaration was inaccurate and that she never spoke to John Woods. That's S.E.R. 94. As the Court pointed out earlier, it was only Mr. Hopper who had one conversation with John Woods. And if you look at that conversation, which is set forth at E.R. 297 to 298, Mr. and Mr. Hopper testified that his declaration sets forth the sum and substance of that conversation. That's S.E.R. 72. Here's the conversation. Quote, I'm sorry. He, quote, asked John Woods questions about the investment as part of our due diligence into the program. John Woods represented that Horizon Private Equity had access to investments in real estate, bonds, and other products offered through Oppenheimer that allowed it to pay a steady rate of interest to investors, 7% at that time, close quote. E.R. That's 297 to 298, as I said. Mooney was the defendant's investment advisor at Southport with respect to their investments in Horizon. According to Mr. Mooney, that's S.E.R. 116. And Mr. Mooney was compensated for advising Southport clients to invest in Horizon. That's S.E.R. 119. And so the question arises on these facts, did the Mitchells or Hoppers purchase the security from Oppenheimer or its associated person Woods in the course of Oppenheimer's investment banking and securities business activities? And the answer is simply no. They purchased Horizon from Mr. Mooney, and Mr. Mooney was an associated person at Southport. And so if there are no further questions. I think not. Thank you very much. Very well, thank you very much, counsel. Mr. Townsend, you have some time left. Thank you. I can be brief. I want to speak to two points made by opposing counsel. One is the simplicity argument. Simplicity is achieved by the account test, but that's been rejected by most circuits as not affecting the intent of FINRA. So you have a direct account relationship. That is an overly narrow definition. I do agree, though, that your clients purchased Horizon from Mr. Mooney, right? Not from Mr. Woods. He was the salesperson representing Mr. Woods's company. I find our submission is overly formalistic to require that the individual be there if he's able to divert the investor through a shell corporation. Was there any evidence that Mr. Woods received any compensation from your clients? Well, he owns Southport, and he used that as part of his Ponzi scheme. The compensation of his Ponzi scheme, yeah, that it all fell into the Ponzi scheme. In the general sense, he did. Yes. Yeah. Is he getting a sliver of the commission? I think that's, again, overly formalistic, and we need to look at what the intent here. I want to look at this Coca-Cola example because I think that's not an appropriate metaphor. And I think because Coca-Cola is not a broker-dealer, and under the Coca-Cola scenario, it'd be one thing if the broker-dealer owned, has controlling interest and owned all the shares in Coca-Cola. That would be a more fitting example. One I struggle with, you live on Bainbridge Island. I do. Beautiful place. Thank you. There's an official ferry that goes back and forth, takes the cars, takes the people. If somebody that had their own ferry but no license to dock there came, you wouldn't be able to take that and be officially recognized, right? You would not? Well, that's— In other words, the dock on both sides where you empty cars in and out is an officially recognized Washington State controlled entity, right? Right. So if you had a private ferry boat and you tried to dock there, you couldn't necessarily do that, could you? Here's what I—here's the metaphor that I would use on the ferry, and thank you.  Thank you for using a hometown metaphor for me. Maybe we're on our way to a Seahawks game.  So imagine that I got on a Kitsap Transit bus that then got on the ferry and said— and then, you know, the ferry crashed and got injured. I mean, we're out of FINRA here, but we're talking about principles of agency and really, I think. You say, well, wait a minute. You know, the ferry—the Kitsap Transit did it here because I'm sitting on a Kitsap Transit bus, but I'm sitting in a ferry that did the problem. So I think we're in a bus in the ferry. We're not in a different ferry. Okay. Thank you. Very well. Thanks to both counsel for your argument. We appreciate it. An interesting case. The case just argued is submitted.
judges: SMITH, VANDYKE, Stinson